STATE, Plaintiff, vs. MARKEY and another, Defendants.

*September 14—October 9, 1951.*

*Harlan B. Rogers,* special counsel for the Board of State Bar Commissioners, for the plaintiff.

For the defendants there was a brief by *Gold & McCann* of Milwaukee, attorneys, and *Daniel H. Grady* of Portage, and *Ray T. McCann* of Milwaukee of counsel, and oral argument by *Mr. Grady* and *Mr. McCann.*

PER CURIAM. In 1944 George T. Wolfer, Sr., was engaged in the business of selling stainless-steel cookware. In October of that year he retained one of the defendants, J. Philip Markey, to organize a corporation for the purpose

of taking over and operating the business under the name of Lifetime Sales, Inc. The stock of the corporation was to be held by Wolfer and his wife, and by one Theodore N. Gould, at that time an employee of Wolfer, and his wife. The articles of incorporation were prepared by Philip, signed by the incorporators, and duly filed and recorded. Philip prepared the other papers necessary for the formation of the corporation but did not follow up to determine whether the action suggested in his prepared papers was ever taken.

In January, 1946, after Philip had performed some professional services for Wolfer, they entered into a written retainer arrangement by the terms of which Philip was to serve as attorney for Wolfer and wife and the Lifetime Sales Corporation, for which he was to be paid $2,500 per year, partly in cash at that time and $200 per month on the first of each month thereafter. In August, 1946, a dispute arose between Wolfer and Gould and on August 12, 1946, the latter commenced an action against Wolfer, his wife, and the corporation, in which an accounting and the appointment of a receiver were demanded. An application for the appointment of a temporary receiver was denied, apparently because the judge of the court considered that all of the issues should be determined upon an early trial; accordingly, the case was set for trial on October 14, 1946, at 10 a. m.

Shortly after the commencement of the Gould case Philip informed Wolfer that he would probably have to be a witness in the case and that it would therefore be necessary that another attorney be engaged to try it; he suggested that his brother, Maurice, be retained for the trial.

The referee reported that Maurice was retained for the trial of the Gould action upon an arrangement that he was to be paid $200 forthwith and in addition, $200 at the completion of the case. Maurice denied that any definite arrangement as to fees had been made. Philip testified that the arrangement reported by the referee was made but that the

payments were to be considered as expense money. The two defendants conferred with Wolfer and his wife and spent several days preceding the trial date in preparation. Maurice testified that he spent every day from the middle of August until the middle of October on the case. Both defendants testified that they had spent approximately ten days previous to the trial in preparation.

During the week preceding the trial date Maurice, with the co-operation of Philip, prepared a contract which, after reciting certain facts as to the previous relationship between the Wolfers and the Markeys, provided for the retainer of Maurice as general counsel at a salary of $1,250 monthly for the period of one year. At the same time another paper was prepared by the Markeys by the terms of which it was proposed that the Markeys should be appointed agents for Wolfer and the corporation to finance, discount, sell, and otherwise dispose of evidences of obligation which Wolfer and the corporation might acquire in their business of selling merchandise. It was provided further that the Markeys should have access to the books and reports of Wolfer and the corporation; that they should have authority to sue for and receive and collect all accounts receivable, etc. The paper contained the provision that ninety per cent of the net profits to be acquired through such financing and discounting should be retained by the Markeys and ten per cent should go to Wolfer and the corporation. It provided further that it should continue in effect until October 10, 1956, unless earlier terminated by mutual consent. Nothing contained in either of these proposed agreements indicated an intent to terminate the retainer contract which Philip had previously obtained.

On either Thursday or Friday of the week preceding the Monday upon which the Gould case was to be tried the two papers were presented to Wolfer for execution, with the suggestion by the Markeys that he study them and submit

them, if he wished, to some other lawyer for examination. On Saturday defendants examined the records in Wolfer's office, apparently for the purpose of trial. On Sunday Markeys called at the home of Wolfer where the latter informed them that he would not sign the contracts. The Markeys testified that they have no recollection that the contracts were discussed on this occasion. At the Sunday visit the Markeys told Wolfer to be available on the telephone the next forenoon but not to go to the courtroom. The reason assigned by them for this suggestion was that they wanted Gould's story to be told upon the trial before Wolfer might be called upon to testify.

Both defendants appeared at the call of the calendar on Monday morning and the case was assigned to Judge BREIDENBACH for trial. Judge BREIDENBACH found himself unable to proceed until some time during the afternoon. The trial of the case was held in abeyance.

There is a sharp dispute with respect to a conversation between Wolfer and Maurice during the afternoon of Monday, the date set for trial of the case. Wolfer testified that in that conversation Markey insisted that the contracts prepared by the defendants be signed if Wolfer expected them to proceed with the trial. Markey's testimony with respect to this conversation is to the effect that it concerned his opinion that the defense of the Gould case would be embarrassed unless an audit by an accountant were made to determine the amount of commissions owing Gould. Wolfer told him that he did not intend to engage an accountant and that in any event he would not pay Gould's claim. Maurice testified further that in response to Wolfer's statement he asked the latter whether he, Markey, should expect to be treated in the same manner for his services in the trial of the Gould case. Later on Monday afternoon Attorney Howard Johnson called Maurice on the telephone and told him that he, Johnson, had been engaged by Wolfer to con-

duct the trial of the Gould case. Markey made no objection to Johnson's statement that he had been so retained. Johnson testified that Wolfer had shown him, apparently at Wolfer's first visit to his office, the two contracts prepared just before the date set for the Gould trial. Johnson called Gould's attorney on the telephone and asked him to appear with him at four o'clock of that afternoon before Judge SULLIVAN to discuss an application by Johnson for a continuance.

The referee in his report appears to doubt Maurice's testimony that in the telephone conversation he had with Wolfer on Monday afternoon he had suggested that an auditor be employed. He appears to conclude that it was not necessary that an accountant be engaged but cites as one of the reasons for the lack of such necessity the fact that a Mr. Zippel, an employee of Wolfer, might readily be able to furnish the information which might be obtained from an accountant.

On October 16, 1946, two days after the Gould case had been set for trial, the Markeys appeared at the office of Attorney Johnson with Wolfer, and delivered either to Wolfer or to Mr. Johnson all of the files having to do with the Gould case which the Markeys had obtained possession of from Wolfer. At that meeting the Markeys asked Wolfer whether he had any complaint with respect to the manner in which the Markeys had handled the matter for him and he responded that he had not. At the suggestion of the Markeys Mr. Johnson then prepared a statement signed by Wolfer and his wife, which contains the following:

"We wish to state here voluntarily in the presence of our attorney, Mr. Howard Johnson, that the services rendered by Attorneys Maurice L. Markey and J. Philip Markey in the above [Gould] case up to the time of the above-referred-to withdrawal [as attorneys] were entirely satisfactory to us."

There were no negotiations or dealings between Markeys and Wolfers subsequent to the meeting of October 16th in

Mr. Johnson's office except that on October 28, 1946, Philip sued Wolfer and his wife and the corporation for services rendered as their attorney. At about the same time Maurice presented to Wolfer and the corporation a statement for services rendered by him. The action of Philip was settled on February 17, 1947, by payment of $5,000.

The action brought by Gould against Wolfer and the corporation was settled on October 24, 1946, by the agreement on the part of Wolfer to pay Gould the sum of $35,000.

Harry S. Sicula who had appeared for Gould in his action against the Wolfers, testified that on the afternoon of the day upon which the Gould case had first been set for trial he received a telephone call from one of the Markeys and was told by him that he "could be assisted on some information;" that he replied by stating that if they had any instrument bearing upon the issues of the trial it was their duty to produce it in court and let the court make the best use of it. He testified further that he suggested that if they wished to see him they might meet him at the Elks Club where he would be for dinner. Philip appeared at the Elks Club. Philip denies that he offered to turn over to Sicula any papers and that Sicula, when they met at the Elks Club, asked him to get to him certain records and that he, Philip, refused. Sicula testified further that a day or two later he was told on the telephone that Mr. Gould was looking for him; that he suggested another meeting at the Elks Club and that at that club he entered Gould's car which was also occupied by both Markeys; that there was again some discussion as to some papers that would be of assistance to Gould and Sicula and that he instructed his client in the presence of the Markeys that no deals could be made.

With respect to the meeting in the car Philip testified in substance that its purpose was to discuss an association between the Markeys and Gould to conduct a business. Sicula's testimony that the Markeys had offered him infor-

mation obtained as attorneys for Wolfer is denied by Philip. In any event, there is no testimony that either of the Markeys ever gave to Sicula or Gould any information which they had acquired by virtue of their employment as attorneys for Wolfer. In fact, it is not so contended by the state.

The state sought to prove that the defendants used information confidentially acquired by them in certain actions brought by former employees of Lifetime Sales, Inc. The referee found, we believe correctly, that the state failed to prove its contention in that respect.

Complaint is made that, in the action brought by Philip for the recovery of attorney's fees, defendants used information which they had acquired as attorneys for and while representing Wolfer and the corporation, that: (1) Maurice sought to use to his advantage the information which he had to the effect that the corporation had not elected any officers or directors; (2) the complaint in Philip's action alleges that Wolfer and his wife had concealed or dissipated assets; that they were insolvent or in imminent danger of insolvency and were about to abscond from the state with their assets and those of the corporation; (3) Philip alleged that shortly before the commencement of his action he had inspected the books and records of the corporation and from that inspection he believed it was insolvent, mismanaged, and its officers intending to defraud its creditors.

In the suit brought by Philip for the collection of attorney's fees he was examined adversely. A subpoena had been served upon him requiring production of any and all documents and papers bearing upon his claim for fees. In the present proceeding he testified that he refused to produce all such documents on the advice of his brother as his attorney. Maurice testified that some of the papers were in his possession as attorney for his brother; that no subpoena had been served upon him and that he did refuse to produce any such documents. In the present proceedings both defendants rec-

ognized that they had been wrong in refusing to produce such documents.

The record discloses that no complaint of misconduct on the part of the defendants had ever been made previous to these proceedings; the same is true as to their conduct since the proceedings were commenced in January, 1950. Eight attorneys, one of them a former judge of the civil court of Milwaukee county, two dentists, and two businessmen were called on behalf of defendants, all of whom testified in a general way that their acquaintance with the defendants indicated to them that defendants' conduct as attorneys had not been objectionable, and that in their opinion each of the defendants possesses the necessary moral fitness properly to practice his profession.

Defendants are brothers and are residents of the city of Milwaukee. They received their legal education at the University of Wisconsin. The defendant, Philip, at the time of the trial was thirty-seven years of age and had practiced law in Milwaukee since 1939. The defendant, Maurice, at the time of the trial, was thirty-nine years of age, and was admitted to practice in 1937. Except for military service from 1942 to 1945, he has also practiced law in Milwaukee since his admission. The defendants are not partners, nor do they occupy the same office.

Four counts are contained in the complaint. They are that the defendants were guilty of unprofessional conduct in that they conspired and acted together:

"1. To secure advantages to themselves to the prejudice of the interests of their clients;

"2. To injure their clients' interests by threatening to withdraw, and withdrawing from, the defense of litigation, at the time set for the trial thereof, with the intent and purpose of forcing their clients to execute agreements to the advantage and benefit of the defendants;

"3. To use for their own benefit and the benefit of others and against the interests of their former clients, information

acquired from their clients in the course of their employment as attorneys;

"4. To attempt to injure their former clients, after withdrawing as attorneys from a case set for trial, by disclosing to the attorney for the adverse party that they had information acquired by them as attorneys which could be made available to the adverse party upon the trial of such cause and which would assist in establishing the cause of the adverse party."

It will be observed from the foregoing that the complaint against defendants is based entirely upon the transactions between them and Wolfer and that the record was made almost exclusively upon Wolfer's testimony, much of it disputed by defendants. Because of his record of previous convictions, his effort to defeat apparently well-grounded claims for services rendered by his employees, his signed statement prepared by and at the suggestion of his substitute attorney, Mr. Johnson, made after his relationship with defendants had terminated, to the effect that he was then satisfied with the services of defendants and had no cause to complain against them, his delay in proceeding against defendants in this proceeding for several years and until after he discovered that they had become interested in a competing business, indicating a desire to avenge himself rather than an interest in protecting the community against the misconduct of his lawyers, we are unable to give any great amount of credence to his story. We prefer to determine what, if any, disciplinary action should be taken upon the undisputed facts appearing in the record.

Criticism is made of the defendants because on the day set for trial of the Gould case Wolfer was told by defendants that he should not appear in court but should take station in a drugstore and hold himself available for call by one of the defendants. The defendants told Wolfer that they did not want him to be present in court because they did not wish that he should be called as an adverse witness prior to

the examination of Gould and his witnesses. The state contends that there was no reason for this suggestion because both parties to the Gould action had already been examined adversely and that there was therefore no occasion to keep Wolfer from the courtroom. The fact is that Wolfer had not been examined adversely. Even if Wolfer had been examined earlier, there still would be no misconduct in the act of defendants advising him to stay away. If there was error in that respect it was rather one of judgment.

It is not disputed that sometime before the date set for the trial of the Gould action Philip suggested to Wolfer that he retain other counsel for the reason that he, Philip, might be called upon to testify at the trial; he suggested, also, that Wolfer retain his brother, Maurice. We do not consider that Philip's suggestions were improperly made, even though it might be considered now that there would have been no occasion for calling upon him to testify. If Philip had any reason to believe that it might be necessary to obtain his testimony, his suggestion, instead of being improper, was in accord with what any lawyer would advise under similar circumstances.

Sometime on the day first set for the trial of the Gould action, one of defendants told Wolfer that an accountant should be engaged to examine the books with respect to Gould's transactions with the proposed corporation. Wolfer objected. His reason for taking exception, which is accepted by the plaintiff as a good one, was that Wolfer had in his employ a Mr. Zippel who was qualified to give any information which a further audit might disclose. It may be true that under the circumstances there was no occasion or need for the engagement of an auditor, but it appears to us that at most this might have been a mistake of judgment, rather than an act of misconduct.

Many of the details respecting the manner and time of presenting the retainer contract and the contract contem-

plating an organization for financing the paper of the corporation are in dispute. The state contends that the defendants presented these proposed contracts with the demand that they be executed as a condition to their continuing in the Gould case as attorneys for Wolfer. There is some evidence which supports the contention. On the other hand, on cross-examination Mrs. Wolfer testified that no demand had ever been made upon her to sign the papers and Mr. Wolfer testified that he knew he was not required to sign it. Defendants seek to avoid criticism of their conduct upon the theory that although the contracts were not signed by Wolfers they were ready on Monday morning to proceed with the trial. We might accept defendants' version of the testimony respecting this transaction; nevertheless, we find reason to criticize them for presenting to Wolfer these proposed contracts by the terms of which Wolfer would have undertaken a considerable liability only a few days before the Gould case—one involving a substantial sum of money—was to be tried. The circumstances existing at the time the proposed contracts were submitted to Wolfer were such as to place upon defendants the burden to show the fairness of the transaction. We do not consider that they have met that burden.

The relation between an attorney and a client is one of trust and confidence which gives the attorney a great advantage over his client and by which he acquires the ability to exercise a strong influence over him. He may not at the threshhold of an important lawsuit employ that influence to exact from his client a contract for an increased compensation, particularly where the circumstances are such as to suggest to the client that he may stand on the morrow without the help of counsel in his defense against a claim of some consequence. It is true that the first contract for compensation was made with Philip and that the one presented just before the trial date was prepared for the engage-

ment and compensation of Maurice. However, it appears to us, because the two were associated so intimately in all the transactions with Wolfer following Maurice's employment, that with respect to this transaction at least we should consider them as one. It is true, also, that it is disputed that Maurice threatened to withdraw from the Gould case unless Wolfer signed the contract. We consider, however, that the relationship between the parties and the circumstances were such at the time as to permit Wolfer to infer that such would be the result. The conduct of the defendants in this transaction is palliated only by the fact that, despite Wolfer's refusal to sign the contracts, they were ready to represent him when the case was set for trial.

Although defendants did not in fact turn over to Mr. Sicula, the attorney for Gould, any documents, or information which they might have had, and which might have been used to Gould's advantage upon the trial, still the mere fact that they approached Sicula and permitted him to infer that they might be able to and would give him such information, although they did not give it to him, is not an occurrence which can properly be approved. It should be observed that the first meeting with Sicula was had at the suggestion of Maurice.

It is undisputed that after the attorney-client relationship between defendants and Wolfer had terminated Philip brought an action against Wolfer for the recovery of fees for his services previously rendered as the latter's attorney and Maurice submitted to him a statement for his fees. In the complaint in Philip's action prayer was made for the appointment of a receiver and attachment proceedings were commenced. It alleges among other things:

(1) That the corporation never had and did not then have any officers or directors. We find no fault with this allegation because it was information which might well have been obtained from other sources.

(2) That Wolfer and wife had concealed or dissipated assets; that they were involved in costly litigation; that they were insolvent or in danger thereof, and that they were about to abscond from the state with their assets and the assets of the corporation. It must not be overlooked that this was an action brought by Philip for the collection of fees claimed by him to have been earned in the employ of Wolfer. It is not as though Philip had used the information for the benefit of another person claiming against Wolfer; nor do we know of any rule which would require an attorney to withhold information received from his client to the effect that the latter was contemplating a criminal or fraudulent act. The following, from 5 Jones, Evidence (2d ed.), p. 4113, sec. 2165, quoted with approval in a report of the committee on professional ethics of the American Bar Association (1947), is applicable:

"It has frequently been held that the rule as to privileged communications does not apply when litigation arises between attorney and client to the extent that their communications are relevant to the issue. In such cases, *if the disclosure of privileged communications becomes necessary to protect the attorney's rights,* he is released from those obligations of secrecy which the law places upon him. He should not, however, disclose more than is necessary for his own protection. It would be a manifest injustice to allow the client to take advantage of the rule of exclusion as to professional confidence to the prejudice of his attorney, or that it should be carried to the extent of depriving the attorney of the means of obtaining or defending his own rights. In such cases the attorney is exempted from the obligations of secrecy."

(3) We believe that we must consider it as a fact that the information that Wolfer was insolvent, as alleged in Philip's complaint, was obtained by them during their representation of Wolfer and that the use of such information might be the subject of criticism. However, we must also consider in

that respect what has heretofore been said regarding disclosure of information which is necessary for an attorney's protection.

It is admitted that when demand was made upon defendants that they return to Wolfer all of the papers which they had obtained in connection with their employment by the latter some of the papers were withheld. The court may not overlook such refusal. Both defendants admitted in these proceedings that they were wrong in refusing to produce the documents. It was not an ethical act.

The test to be applied in a proceeding such as this is: Should a person lacking in moral sense and appreciation of the relation of attorney and client be permitted in the public interest to continue in the practice of law? *State v. Kern,* 203 Wis. 178, 233 N. W. 629. We have pointed out the practices of the defendants, which we consider to be unethical. We cannot say, however, that these violations demonstrate that either of the defendants is unfit to continue the practice. Their previous good record and that maintained since these proceedings were instituted suggest that their infractions will not be repeated. We conclude that there should be no order of suspension, but in view of their unethical conduct referred to, we should not dismiss the proceedings with a mere reprimand. They should pay all of the costs of this proceeding, which it appears will involve a considerable sum.

*By the Court.*—It is ordered and adjudged that the defendants be required to pay the costs and expenses of these proceedings, including the fees of the referee, the attorney for the plaintiff, the official reporter, and the clerk, and the cost of printing the plaintiff's appendix and brief; that they be suspended from the practice of law until they furnish to the court evidence of payment of the costs ordered to be paid by them.